# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Kendrick Ledelle Dotstry,<br><br>    Defendant. | Case No. 16-cr-346 (SRN/HB)<br><br>**REPORT AND RECOMMENDATION** |

Andrew Dunne, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

F. Clayton Tyler, F. Clayton Tyler, P.A., 331 Second Avenue South, Suite 230, Minneapolis, MN 55415, for Kendrick Ledelle Dotstry

HILDY BOWBEER, United States Magistrate Judge

  This matter is before the Court on Defendant Kendrick Ledelle Dotstry's Motion to Suppress Statements [Doc. No. 24]. Dotstry had previously filed a Motion to Suppress Evidence Obtained from Search and Seizure [Doc. No. 25], but withdrew that motion in his post-hearing briefing. Dotstry's nondispositive motions were addressed in a separate Order [Doc. No. 30]. The matter has been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a).

I.  **Procedural Background**

On December 21, 2016, Defendant Kendrick Ledelle Dotstry was charged by Indictment with one count of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Indictment at 1-2 [Doc. No. 1].)  Dotstry filed the motion to suppress statements on February 14, 2017.  The Government opposed the motion.

The Court held the pretrial motion hearing on March 2, 2017 [Doc. No. 28].  During the hearing, the Government called Minneapolis Police Officer Andrew Schroeder.  The Government also submitted the following three exhibits: (1) a CD containing audio of Minneapolis Police Department 911 calls (Gov't Ex. 1); (2) a CD containing video from a Minneapolis Police Department body camera (Gov't Ex. 2); and (3) a CD containing video from a Minneapolis Police Department squad car camera (Gov't Ex. 3).  Dotstry did not call any witnesses or submit any exhibits.

Dotstry submitted supplemental post-hearing briefing in support of his motion on March 23, 2017 [Doc. No. 32].  The Government submitted its supplemental memorandum in opposition on March 28, 2017 [Doc. No. 33].  The Court took the motion under advisement at that time.

For the reasons set forth below, the Court recommends the Motion to Suppress Statements be denied.

II.  **Relevant Facts**

On November 19, 2016, officers from the Minneapolis Police Department responded to several 911 calls reporting a domestic abuse in progress.  Callers provided the location and a description of the suspect and the suspect's vehicle.  They also advised

that the suspect was pointing a gun with a laser at various members in the apartment complex. Officers arrived on the scene and located a vehicle and suspect matching the description. The driver of the vehicle, later identified as Dotstry, pulled his vehicle over to the side of the road. (Squad Car Camera Video (Gov't Ex. 3.)) Officers then initiated a stop by activating their emergency lights. (*Id.*) The officers drew their guns and shouted several urgent commands at Dotstry, including to put his hands up inside the car, to get out of the car, and to walk backwards toward the squad car. (*Id.*) Dotstry did not initially comply with the commands, and he appeared to duck down out of sight in his vehicle after officers commanded him to exit the vehicle. (*Id.*) But Dotstry eventually exited the vehicle with his hands up and, as directed, walked backward towards the squad car and kneeled on the ground with his hands behind his head. (*Id.*)

Officer Schroeder asked Dotstry if he had a gun on him, and Dotstry responded that he did not. (Body Camera Video (Gov't Ex. 2).) Officer Schroeder began handcuffing Dotstry and taking him into custody. (*Id.*) He then asked Dotstry whether there was a gun in the vehicle, and Dotstry did not initially respond. (*Id.*) The following exchange then occurred:

> Officer: We got a call you were pointing a gun around.
> Driver: I was pointing a gun?
> Officer: That's why we're here
> Driver: I do have one. There's one in the car.
> Officer: Is there one in the car?
> Driver: Yes, sir.
> Officer: Do you got a permit for it?
> Driver: No, I don't, sir.
> Officer: Ok. Very good. Right now you're under arrest for possession of a handgun, ok?
> Driver: Yes, sir.

3

>Officer: You want to tell me where it is just so my officers-
>Driver: It's in the middle console.

(*Id.*, as quoted in Def.'s Mem. Supp. Mot. Suppress Statements at 2 [Doc. No. 32].)[1]

As this discussion took place, other officers approached the vehicle and ultimately retrieved a loaded Sig Sauer 9-millimeter handgun from the center console. (Gov't Exs. 2, 3.)

Officer Schroeder next transported Dotstry to the jail in his squad car. There was some exchange between them on the way, much of which was initiated by Dotstry; however, the Government represented during the hearing that it will not seek to introduce any statements Dotstry made while being transported in the squad car, and Dotstry does not argue they were relevant to the issues before the Court. Accordingly, the Court does not recount that exchange here other than to note that while in the squad car, Dotstry asked Officer Schroeder why the officer was not reading him his *Miranda* rights. Officer Schroeder replied that the investigators would do that because it was the investigators, not Officer Schroeder, who would be interviewing Dotstry and asking him questions. (Gov't Ex. 3.)

---

[1] Neither party provided the Court with a formal transcription of Government Exhibit 2, and it is difficult to quote it precisely, in part because Dotstry and Officer Schroeder sometimes talk over each other. The following quoted excerpt is taken from Dotstry's memorandum in support of his motion and appears to be roughly correct. Having listened to the recording, however, the Court notes that Officer Schroeder's final sentence in that excerpt likely was "You want to tell me where it is just so my officers' safety. . ." but was interrupted toward the end by Dotstry's statement that the gun was in the middle console.

Officer Schroeder and Dotstry eventually arrived at the sally port to the jail. While in the sally port, Dotstry asked Officer Schroeder questions such as the "time" he would be facing. Officer Schroeder responded something to the effect of "everything happens for a reason" and "at least you're above ground." Dotstry informed Officer Schroeder that he had initially considered coming out of his vehicle with his gun, but reconsidered because he was a new father. Officer Schroeder thanked Dotstry for being cooperative and transferred him to jail personnel. They had no further interaction.[2]

### III. Applicable Legal Standard

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Those procedural safeguards are met when, "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These "*Miranda* warnings" are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322 (1994).

*Miranda* warnings are required only when an individual is subject to interrogation. *United States v. Nguyen*, 608 F.3d 368, 374 (8th Cir. 2010). "Interrogation . . . must

---

[2] The Government did not provide a video or audio of the encounter in the sally port. The recounted facts of the encounter in the sally port are based on Officer Schroeder's testimony at the hearing.

5

reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "Interrogation" for purposes of *Miranda* includes not only "express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Although the latter definition focuses on the suspect's perspective, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302. In other words, police officers "cannot be held accountable for the unforeseeable results of their words or actions" *Id.* at 301-02. "Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005).

IV.   Analysis

Although it appears the Government intends to introduce both Dotstry's statements made at the scene of the traffic stop and the statements made in the sally port (although not the statements made in the squad car during his transport following the stop), Dotstry's post-hearing brief discusses only the statements made at the scene of the traffic stop and why they should be suppressed. It does not address, or even mention, the statements made in the sally port, and so the Court will focus on the circumstances of the statements made during the stop.

6

### A. Statements Made During Initial Encounter with Officers

Dotstry argues the statements and questions by Officer Schroeder at the scene were the functional equivalent of interrogation, and Dotstry should have been advised of his *Miranda* rights. The Government does not appear to dispute that Dotstry was in custody at the scene, but argues the questions and statements fell under the public safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649 (1984), and that Dotstry's statements in response were therefore admissible.

In *Quarles*, a woman approached police officers, explained that she had been sexually assaulted, described her assailant, and stated that he had just entered a nearby supermarket while carrying a gun. *Id.* at 651-52. One of the police officers spotted an individual matching the woman's description, later determined to be the defendant, and pursued him through the supermarket. *Id.* at 652. The officer lost sight of the defendant but eventually apprehended him. *Id.* The officer stopped and frisked the defendant, noticed that he was wearing an empty shoulder holster, and handcuffed him. *Id.* The officer asked the defendant where the gun was, and the defendant nodded toward empty cartons and responded that the gun was by the cartons. *Id.* The Supreme Court refused to suppress that statement, finding that a *Miranda* warning is not necessary when it is "necessary to secure [law enforcement's] safety or the safety of the public." *Id.* at 659. The Supreme Court held this "narrow exception" to *Miranda* "will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it." *Id.* at 658.

Subsequent Eighth Circuit cases have interpreted and applied *Quarles* to other fact patterns. In *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008), Iowa police stopped the defendant's vehicle for a loud music violation. The officers arrested the defendant when they discovered he was barred from driving in Iowa. *Id.* at 1008. During a search of the defendant and his vehicle, they uncovered marijuana, cash, two cell phones, and an unloaded revolver. *Id.* Officers asked the defendant if there was anything else they should know about that was going to hurt them. *Id.* The defendant responded that he knew the revolver was there, but that it was not his. *Id.* The *Liddell* court declined to suppress that statement, emphasizing that the public safety exception encompasses "protection of the police officers themselves," and further observing that its application "does not depend upon the subjective motivation of the questioning officers." *Id.* at 1009. Additionally, although the defendant argued the exception should not apply because the revolver had already been found, the defendant was handcuffed, and there was therefore no immediate danger, the Eighth Circuit pointed to prior cases in which the exception had been applied even when the suspect had been arrested and secured. *Id.* Even where a suspect is in custody, "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis" to invoke the exception to *Miranda*. *Id.* (citing *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999); *United States v. Luker*, 395 F.3d 830 (8th Cir. 2005)).

In the instant case, officers responded to 911 calls that reported a domestic assault in progress at an apartment complex. The officers received a description of the suspect

8

and learned he was pointing a gun at various individuals in the complex. When officers arrived at the scene, they located the pickup truck and suspect matching the description from the 911 calls, and pulled him over. Dotstry does not argue the officers lacked probable cause to believe he was the person described in the 911 calls. The officers exited the squad car with their guns drawn and shouted commands at the driver. But the driver, later identified as Dotstry, did not initially comply with these commands. At one point, he disappeared from the sight of the officers and ducked down in the front seat of the truck. Eventually, however, he complied with their commands, and he was secured.

As other officers approached the pickup to determine if there were any other occupants of the vehicle, Officer Schroeder approached Dotstry and asked questions to determine whether he was armed and whether there was a gun in the truck. Dotstry told Officer Schroeder that there was a gun located in the center console of the truck.

Dotstry cites *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980), apparently in support of his argument that the interaction between Dotstry and the officers constituted interrogation. In *Innis*, a man was arrested for murder, was Mirandized, and invoked his right to a lawyer. *Id.* at 293-94. He was put in a police vehicle with three police officers. *Id.* at 294. While on their way to the police station, two of the officers started talking to each other, in plain earshot of the detained suspect, about the "school for handicapped children" nearby. *Id.* They expressed fears that a child might find the weapon and that she might kill herself with it. *Id.* at 294-95. They talked about how important it would be for them to find the gun so that this would not happen. *Id.* at 295. Apparently troubled by this conversation, the suspect told the police where the gun was. *Id.* But

9

while the Court held that interrogation can also include statements by officers that are the functional equivalent of interrogation, it concluded that in the circumstances before it, the officers should not have known their conversation was "reasonably likely to elicit an incriminating response." *Id.* at 301-04.

Dotstry does not explain how *Innis* supports his position in this case. Not only were the defendant's statements in *Innis* not suppressed, but here, even more than in *Innis*, the statements and questions from Officer Schroeder were brief and directed to determining the location of the firearm while the officers were at the scene and actively attempting to secure it. At the time Officer Schroeder asked about the location of a firearm, it was not known whether the firearm was in a place—whether inside or outside the vehicle—where it could be accidentally mishandled by officers or accessed by members of the public, including children, or whether there was another individual in the vehicle who could access the firearm. While Dotstry himself was secured in an area away from the pickup, this does not eliminate the public safety concern for officers searching the pickup. *See United States v. Cesario*, No. 14-cr-0092 (PJS/TNL), 2014 WL 3577436, at *7, (D. Minn. June 30, 2014) *R. & R. adopted* (D. Minn. July 18, 2014) (citing *Liddell*, 517 F.3d at 1010). The Court therefore recommends denying Dotstry's motion to suppress statements made during his initial encounter with officers on the ground of the public safety exception to *Miranda*.

### B. Statements Made While in the Sally Port

While Dotstry's brief does not mention or appear to argue for suppression of the statements Dotstry made to Officer Schroeder while they were in the sally port of the jail,

the Court will address them in an abundance of caution. The Government argues these statements were voluntary and not the result of interrogation.

Officer Schroeder testified at the hearing that Dotstry initiated the conversation in the sally port. There is no evidence that any of the statements Dotstry made in the sally port were in response to a question by an officer, or that anything said by an officer in the sally port "functioned" as interrogation. Accordingly, the Court finds Dotstry's statements in the sally port to be voluntary and not the product of interrogation.

## V.     Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 24] be **DENIED**.


Dated: April 12, 2017                                  s/ *Hildy Bowbeer*
                                                       HILDY BOWBEER
                                                       United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.